UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RALPH DALEY,

        Plaintiff,

v.

CHARTER TOWNSHIP OF
CHESTERFIELD,

        Defendant.

_____/

Case No. 11-12562

Honorable Nancy G. Edmunds

**OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT [29]; AND (2) GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [42]**

Plaintiff filed this lawsuit on June 13, 2011, bringing claims under 42 U.S.C. § 1983, and alleging that Defendant violated his procedural due process, equal protection, substantive due process, and First Amendment rights.  Specifically, Plaintiff alleges that Defendant violated his:  (1) procedural due process rights when Defendant issued stop work orders in connection with Plaintiff's laundromat on February 24, 2010 and March 24, 2010 without affording him notice and an opportunity to be heard; (2) equal protection rights by selectively enforcing its Ordinances as to Plaintiff's garage and refusing to issue the final Certificate of Occupancy for Plaintiff's home within five business days of his  April 14, 2011 letter request; (3) substantive due process rights when Defendant delayed the final Certificate of Occupancy for Plaintiff's home; (4) First Amendment rights by delaying the final Certificate of Occupancy for Plaintiff's home in retaliation for his post-June 29, 2009 zoning board appeals and his July 2010 appeal to the Macomb County Circuit Court (*Daley*

*III*); and (5) First Amendment rights by issuing the March 24, 2010 stop work order in retaliation for Plaintiff's protest of the water/sewer fees he was required to pay as a pre-condition for approval of his application for an Interior Finish Building Permit in connection with his laundry business.  (Pl.'s Resp. at 1, 13-14.)

For the reasons stated below, Plaintiff's motion for partial summary judgment on his procedural due process claim is DENIED, and Defendant's motion for summary judgment on all claims is GRANTED.

## I.   Facts

The following facts are to provide background only.  Plaintiff concedes that none of the constitutional claims he alleges in this lawsuit "rely on factual matters prior to June 25, 2009," the date the Michigan Court of Appeals issued its decision in Plaintiff's second state-court action challenging Defendant's decisions regarding the attached garage to his Chesterfield Township home.  (Pl.'s Resp. at 13-14.)  The facts giving rise to Plaintiff's claims addressing his laundry business and those addressing the final Certificate of Occupancy for his home are addressed below.

### A.  Pre-June 25, 2009 Facts

In 2004, Plaintiff began construction on his home.  The focus of Plaintiff's previous state court litigation and zoning board appeals has been on the architectural plans for his residential garage.  Initially, "Plaintiff's architectural plans depicted a garage, approximately 910 square feet in area, with two sixteen-foot-long garage doors."  *Daley v. Charter Twp. of Chesterfield (Daley I)*, No. 265363, 2007 WL 911923, at *2 (Mich. Ct. App. Mar. 27, 2007).  Defendant Township had a zoning ordinance that precluded  an accessory building

that was "designed to house more than three cars" or exceeded "920 square feet." *See* Clinton Twp. Ord. § 76-331(a)(2)(a). "In 2004, [P]laintiff applied to [Defendant Township]'s zoning board of appeals (ZBA) for a variance from § 76-331, which was denied." *Daley v. Charter Twp. of Chesterfield (Daley II)*, No. 285723, 2009 WL 1830728, at *1 (Mich. Ct. App. June 25, 2009). Rather than appeal the ZBA's decision, Plaintiff filed a lawsuit in state court challenging the constitutionality of the zoning ordinance. *Id.*

On March 9, 2005, Defendant issued Plaintiff a temporary Certificate of Occupancy, Plaintiff moved into his home, and has lived there ever since. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 21-22; Pl.'s Am. Compl. at ¶ 18.)

### 1. Plaintiff's 2004 State-Court Action and March 27, 2007 Michigan Court of Appeals Decision (*Daley I*)

In his first state-court lawsuit, Plaintiff objected to Defendant Township's use of its zoning ordinance, § 76-331(a)(1)(a), "to disallow plaintiff's installation of two sixteen-foot-long doors on his garage." *Daley I*, 2007 WL 911923 at *1. The Michigan Court of Appeals affirmed the trial court's dismissal of Plaintiff's complaint holding that the ordinance was not unconstitutionally vague. The court also rejected Plaintiff's argument that the ordinance could not "properly be interpreted as regulating doors;" concluded that "the trial court did not err in holding that the ordinance provides fair notice of the conduct proscribed;" rejected Plaintiff's argument that the ordinance "confers unfettered discretion" to the Township's zoning board of appeals; concluded that "[t]he ordinance contains adequate standards with which to guide defendants in applying it, and it appears to be applied consistently throughout the township;" and rejected Plaintiff's argument that his substantive due process rights were violated because the ordinance "was based solely on aesthetics" and thus did

3

not advance a reasonable government interest.  *Id.* at **1-5.  The Michigan Court of Appeals held that "[o]ne way in which a garage designed to hold more than three cars is manifested is by having two sixteen-foot-long doors."  *Id.* at *2.

### 2. Plaintiff's 2007 State-Court Action and June 25, 2009 Michigan Court of Appeals Decision (*Daley II*)

"In 2007, [P]laintiff submitted a revised plan to the township that replaced the parking space for a fourth car with a 100 ft. craft room.  However, the revised garage still called for two sixteen-foot garage doors, so the township's building official, . . . Shawn Shortt, denied the plans as not complying with the zoning ordinance."  *Daley II*, 2009 WL 1830728, at *1. Plaintiff requested an appeal to Defendant's construction board of appeals, and Defendant Township and Building Official Shawn Shortt "countered that the decision was not a construction code dispute, but a zoning ordinance dispute."  *Id.*  Rather than appealing to the ZBA or applying for a variance, Plaintiff filed his second state-court lawsuit.  *Id.*

In his second state-court lawsuit, Plaintiff alleged claims for a writ a mandamus, injunctive relief, declaratory relief, and claims under 42 U.S.C. § 1983 alleging that his procedural and substantive due process, equal protection, and First Amendment rights were violated by Defendant Township's selective enforcement of its zoning ordinance in retaliation against him for filing his earlier lawsuit.  The trial court granted Defendant Township's and Building Official Shortt's motion for summary disposition.  (Def.'s Mot., Ex. 4, *Daley v. Charter Twp. of Chesterfield and Shawn Shortt*, Macomb County Circuit Court Case No. 2007-2847-AW, May 8, 2008 Slip Op. at 5.)  It first determined that application of the collateral estoppel doctrine precluded Plaintiff's suit.

> Plaintiff is presently attempting to revisit the same issue that was already resolved in the prior action and which was of primary concern to the Court of

4

> Appeals:  the existence of the two sixteen-foot-long garage doors.  The Court is mindful that plaintiff's revised plan includes a storage area, which decreases the 920-foot maximum allowed.  Notwithstanding, this additional storage area does not remedy the matter of the subject doors.  As reflected in the appellate decision, plaintiff's present proposed storage area is merely consistent with the purpose of allowing a 920-foot garage.

*Id.*  Although it found that collateral estoppel precluded Plaintiff's lawsuit, the trial court went on to address Plaintiff's claims.  It determined that, "[i]n any event, plaintiff would not be entitled to a writ of mandamus," because "plaintiff failed to appeal to the ZBA."  *Id.* at 6.  The trial court then addressed Plaintiff's civil rights claims.  It determined that, "[e]ven if plaintiff's redesigned garage plan were viewed as an entirely new application, his federal and state constitutional claims would be barred for his failure to exhaust his administrative remedies by appealing to the ZBA."  *Id.*  Alternatively, the trial court concluded that Plaintiff could not establish a "viable disparate treatment claim since he had not established that he was treated differently from other similarly situated property owners, particularly since the other properties that he raised were apparently subject to different ordinance provisions," and likewise could not establish "that the ordinance provision governing plaintiff's garage was selectively enforced," or that "defendant's failure to approve the new garage plan was triggered by animosity over the prior suit."  *Id.* at **6-7.

On June 25, 2009, the Michigan Court of Appeals affirmed the trial court's decision holding that "[b]ecause plaintiff failed to exhaust all administrative remedies, the trial court properly granted defendants' motion for summary disposition. . . ."  *Daley II*, 2009 WL 1830728, at *1.  "The proper avenue for plaintiff's appeal was to the township's ZBA, not the construction board of appeals."  *Id.*  As the *Daley II* court explained,

> At issue in this case is whether the revised plans comply with Chesterfield Township Zoning Ordinance § 76-331(a)(2)(a).  In plaintiff's letter submitting his

5

> revised plans he stated that with the change in design the building "should" now be in compliance with the ordinance.   Therefore, the appropriate board of appeals is the ZBA.

*Id.* at *2.  The court observed that the "2007 and 2004 plans" were different because "[t]he 2007 plans were revised to include a craft room, which <u>could</u> rebut the presumption decided in the first ZBA decision that two sixteen-foot garage doors means a four-car garage.  Because the crux of the 2007 and 2004 plans were not the same, pursuant to MCL 125.3603(1) an appeal regarding the 2007 revised plans must be taken to the ZBA." *Id.* (emphasis added).

The *Daley II* court also rejected Plaintiff's argument that "an appeal to the ZBA would be futile because the board is biased against him."   *Id.*   It found that the futility exception does not apply under circumstances where "the plaintiff has failed to obtain a final decision from the board."   *Id.*   "Without giving the ZBA a chance to make a final decision, it is impossible to determine that the ZBA is biased against plaintiff."   *Id.*  The Michigan Court of Appeals further held that "Plaintiff must appeal the township's decision to the ZBA before he can bring his 42 USC 1983 claim."  *Id.* (citing *Williamson Cnty. Reg'l Planning Comm. v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985) and observing that "a plaintiff must obtain a final decision regarding the application of a zoning ordinance from the appropriate administrative body prior to initiating a 42 USC 1983 action.").

### 3.  Plaintiff's ZBA Appeal - Revised 2007 Plan - May/June 2010

The Michigan Court of Appeals' decision in *Daley II* was issued on June 25, 2009. Almost a year later, in May 2010, Plaintiff sought a hearing before Defendant's ZBA on his 2007 revised garage plans.  (Pl.'s Am. Compl. at ¶ 54 and Ex. 17, Pl.'s application.)  A hearing on his appeal was held on June 9, 2010.  (Pl.'s Resp., Ex. 16, ZBA 6/9/10 minutes.)

6

Plaintiff's counsel, Mr. Hyde, argued that, consistent with what the *Daley II* court said, the inclusion of a 100-foot craft room in the 2007 revised plans, rebuts the presumption that two 16-foot garage doors means a four-car garage and the need for Plaintiff to seek a variance. (*Id.* at 2-3, 5.) Building Official Shortt testified that, if Plaintiff's design was for three cars and a craft room, that craft room would have to be a habitable room with lights, electrical outlets, windows, heat, insulation, 8% glass, a fire-rated door, and a separation from the garage, and Plaintiff's 2007 revised plans did not include any of this. (*Id.* at 3.) After considerably more discussion, the ZBA denied Plaintiff's appeal. *Id.* at 8.

### 4. Plaintiff's July 2010 State-Court Action and March 15, 2011 Trial Court Decision (*Daley III*)

On July 6, 2010, Plaintiff filed his third state-court lawsuit. *Daley v. Charter Twp. of Chesterfield Zoning Board of Appeals (Daley III)*, Macomb County Circuit Court No. 2010-2795-AV. "Pursuant to a September 8, 2010 stipulated order, the matter was remanded to the ZBA to assure the parties that the ZBA members had before them a full and complete copy of the building department file for review prior to making a decision." *Id.*, March 15, 2011 Slip Op. at 2.

On October 13, 2010, Defendant's ZBA once again considered and denied Plaintiff's appeal because Plaintiff had not presented plans for a garage that housed three cars and a craft room that satisfied the building requirements for a habitable room. (Pl.'s Resp., Ex. 17, 10/13/10 ZBA minutes at 2-8.) After the ZBA's denial of Plaintiff's appeal, Plaintiff returned to state court.

On March 15, 2011, the Macomb County Circuit Court reversed the ZBA's June 9, 2010 and October 13, 2010 decisions denying Plaintiff's 2007 revised plan for his garage

7

that included a craft room.  *Daley III*, Macomb County Circuit Court No. 2010-2795-AV, March 15, 2011 Slip Op. at 5.  The *Daley III* court agreed with Plaintiff's argument that "the ZBA erred by deciding the matter as a construction issue" rather than a zoning issue.  *Id.* at 2.  After clarifying that the issue the ZBA should have considered was "whether [Plaintiff]'s revised plan complies with or is in violation of [§ 76-331(a)(2)(a) of Defendant's zoning] ordinance," *id.* at 4, the *Daley III* court concluded that Building Official Shortt should not have applied the construction code for "habitable" rooms to Plaintiff's 2007 revised plan, and the ZBA improperly relied on Shortt's mistaken application of the construction code when it denied Plaintiff's appeal.  "In reality, they regarded the matter to constitute a building code issue, rather than a zoning issue, when the opposite was true."  *Id.* at 5.  "Since the revised plan shows that the subject space can no longer accommodate four cars and since it does not exceed the maximum allowed footage, the ZBA's June 9, 2010 and October 13, 2010 denials of [Plaintiff]'s revised plan was contrary to the ordinance, not supported by the evidence, and amounted to an abuse of discretion."  *Id.*  The *Daley III* court cautioned, however, that its ruling "does not suggest that [Plaintiff] does not have to comply with all applicable construction code requirements."  *Id.* at 5 n.3.  It found only "that a zoning issue should not be confused with a construction code issue."  *Id.*

## II.   Summary Judgment Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Revised

8

Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366,

9

370 (6th Cir. 2002).

## III.  Analysis

Plaintiff asserts constitutional claims arising out of Defendant's actions regarding both his laundry business and his home.  Defendant challenges each of Plaintiff's claims on ripeness grounds; and so, the Court begins its analysis with a discussion of the ripeness doctrine.  It then addresses Plaintiff's constitutional claims arising out of Defendant's actions regarding his laundry business and, finally, those regarding his home.

### A.  Ripeness

The question whether an issue is ripe for judicial review invokes "one of several principles of justiciability" and "arises in those cases anchored in future events that may not occur as anticipated, or at all." *Insomnia, Inc. v. City of Memphis*, 278 F. App'x 609, 612 (6th Cir. 2008) (internal quotation marks and citations omitted).  "The doctrine is designed to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Id.* (internal quotation marks and citations omitted).

The ripeness doctrine has evolved over time.  In "cases alleging a taking of a property interest," the Supreme Court has "broadened this ripeness inquiry" to "first requir[e] that the government entity . . . reached a final decision regarding the interest at issue." *Dubuc v. Twp. of Green Oak*, 406 F. App'x 983, 990 (6th Cir. 2011) (citing *Insomnia, Inc.*, 278 F. App'x at 612 and discussing *Williamson Cnty. Reg.'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985)).  In *Williamson County*, the Supreme Court held that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the

10

procedure and has been denied just compensation." *Williamson Cnty.*, 473 U.S. at 195.

This is commonly referred to as a "finality requirement."

The Sixth Circuit has "extended this finality requirement beyond claims of regulatory

takings to various other constitutional claims arising out of land use disputes." *Dubuc*, 406

F. App'x at 990 (internal quotation marks and citation omitted).  The policy considerations

that underlie this extension of the finality requirement in this context include:

> 1) development of a full record; 2) demonstration of precisely how a regulation
> will be applied to a particular piece of property; 3) providing the relief the
> property owner seeks without judicial entanglement in constitutional disputes, so
> that disputes can be decided on non-constitutional grounds whenever possible;
> and 4) appreciating that land-use disputes are uniquely matters of local concern
> more aptly suited for local resolution.

*Id.* at 990, n.9.

There is one type of constitutional claim arising out of land use disputes that the Sixth

Circuit does not apply this finality requirement, i.e., procedural due process claims. *See*

*Insomnia, Inc.*, 278 F. App'x at 614 (citing *Nasierowski Brothers Invest. Co. v. City of*

*Sterling Heights*, 949 F.2d 890, 893 (6th Cir. 1991)).   More accurately, the finality

requirement is not applied "to only a subset of *purely procedural* challenges to land use

regulations."  *Id.* (emphasis in original) (citing *Bigelow v. Mich. Dep't of Natural Res.*, 970

F.2d 154, 159 (6th Cir. 1992)). The distinguishing fact between *Nasierowski* and *Bigelow*

is that in *Bigelow* the plaintiffs brought additional constitutional claims along with their

procedural due process claim and in *Nasierowski* they did not.   The *Bigelow* court

explained why the finality requirement applied in circumstances where a procedural due

process claim was joined with another constitutional claim:

11

Until the state courts have ruled on the plaintiffs' inverse condemnation claim, this court cannot determine whether a taking has occurred, and thus cannot address the procedural due process claim with a full understanding of the relevant facts. Furthermore, addressing the plaintiffs' procedural due process claim at this stage of the proceedings would allow future plaintiffs effectively to circumvent the ripeness requirement for takings claims simply by attaching a procedural due process claim to their complaint. . . .

*Bigelow*, 970 F.2d at 160.

Having addressed the general principles of the ripeness doctrine as applied in the Sixth Circuit, the Court now addresses Plaintiff's constitutional claims arising out of Defendant's post-June 25, 2009 conduct regarding his construction of a laundry business in Defendant Township.

### B. Plaintiff's Laundry Business - Constitutional Claims

As to his laundry business, Plaintiff asserts a procedural due process claim alleging that he was denied notice and an opportunity to be heard before February 24 and March 24, 2010 Stop Work Orders were posted at his proposed laundromat and a First Amendment claim alleging that Defendant issued the March 24, 2010 Stop Work Order in retaliation for his protest of sewer and water tap fees. (Pl.'s Resp. to Def.'s Mot. at 1.) Following a recitation of the relevant background facts, the Court first considers Plaintiff's procedural due process claims.

### 1. Background Facts

### a. Plaintiff Leases Commercial Units and Applies for Building Permits

In January 2010, Plaintiff began working with Defendant to facilitate his construction of a coin-operated laundry business at two commercial units in the Maplewood Plaza, on

23 Mile Road in Chesterfield Township that had previously housed a pizzeria and a mortgage company.  Plaintiff's business, The Laundry Stop, Inc., had leased the two commercial units from the Plaza's landlord.

On January 29, 2010, Plaintiff's attorney, Roger Hyde, wrote to Janice Giese, Administrator of Defendant's Planning and Zoning Commission.  Plaintiff had applications for two building permits -- one to demolish an interior wall and another to perform interior finish work  -- pending at the time.  Plaintiff's attorney explained that the permits were needed to complete "a build-out for a coin-operated laundry" located on 23 Mile Road in an area zoned as a C-3 District, that Plaintiff's intent to change the leased commercial space to a coin-operated laundry did not involve any substantial change in use or class of use to the leased premises that had previously housed a pizzeria and a mortgage company, and requested that Ms. Giese review Plaintiff's file and "release the site plan review requirement" that was holding up Plaintiff's project.  (Pl.'s Mot., Ex. 5, 1/29/10 letter.)

### b.  February 1, 2010 - Plaintiff Gets Permit for Demolition Work

On February 1, 2010, Defendant issued Plaintiff a Building Permit allowing him to "demolish interior wall." (Def.'s Resp., Ex. 3.)  The permit was signed by Mr. Shortt.  (*Id.*)

### c.  Plaintiff's February 1, 2010 Administrative Approval Request

Defendant's Building Official, Shawn Shortt, testified that he had reviewed the construction documents for Plaintiff's proposed laundromat.  He then had a conversation with Plaintiff and told him that he must go to the Planning Commission for plan approval because the new laundry business involved a different use of this commercial space, and that it was Ms. Giese, Administrator of Defendant's Zoning and Planning Commission, and

not Shortt who would make the decision whether the change in use required full review by the Commission or not. (Pl.'s Mot., Ex. 12, Shortt 10/5/11 Dep. at 49-57.)  Copies of Plaintiff's plan drawings were then distributed.  Shortt kept one and other copies were distributed to the builder, the Water Department, the Fire Department, and the Mechanical Inspectors.  (Short Dep. at 56.)

On February 1, 2010, Plaintiff submitted a Planning Commission Administrative Approval Form "designed for 'minor' changes and or improvements to a site."  (Def.'s Resp., Ex. 2, Admin. Approval Req. #45.)  If the Commission agreed with Plaintiff that there would be only minor changes and improvements to the site proposed for Plaintiff's laundry business, then approval would be granted and Plaintiff would be allowed to obtain building permits without the Commission's pre-approval of his site plan.

On February 9, 2010, Defendant's engineering firm, Anderson, Eckstein and Westrick, Inc., wrote to Administrator Giese with the results of its review of Plaintiff's Administrative Approval Request.  It was recommended that "approval be withheld until all planning concerns" were addressed to the satisfaction of the Planning Commission.  (Def.'s Resp., Ex. 4.)  Defendant's engineers advised that (1) "[a]dditional sanitary sewer and water privilege fees" be required to pay "for this more intense usage;" (2) "[m]ore detail relating to the number of washing machines and other proposed improvements" be provided "to the Water and Sewer Department;" and (3) "separate water and sewer services be extended to this user."  (*Id.*)

### d.  February 9, 2010 Planning Commission Meeting

On February 9, 2010, Defendant's Planning Commission held a meeting, and

14

Plaintiff's Administrative Approval Request was addressed.  Plaintiff appeared at the meeting along with his business partner, Sanford Green, who told the Commission that, as to the engineer's statement about water and sewer fees, "[t]here is a set schedule of extra fees that a Laundromat has to meet.  It is $27,000.00." (Def.'s Resp., Ex. 5, 2/9/10 Minutes at 7.)  Mr. Sanford told the Commission that "[t]hey have already agreed to pay it per the existing schedule." (*Id.*)  But, they were "surprised and baffled" by the engineering firm's recommendation that a dedicated water line be extended to the Laundromat. (*Id.*)  The Commission members determined that Plaintiff's Administrative Approval Request must be tabled so he could provide them with a site plan that included the number of parking spaces on the site, the number of washing machines to be installed, and a interior layout of those machines. (*Id.* at 7-8.)

On February 11, 2010, in preparation for the Planning Commission's February 23, 2010 meeting, Plaintiff sent them copies of a detailed site plan for his laundry business, his building plans, a copy of a February 4, 2010 letter from his engineer Paul Clemente to Administrator Giese stating his opinion that a site plan review would not be required, and a copy of a February 4, 2010 letter from engineer Clemente to Plaintiff reporting on the calculation of water supply, drainage, and plumbing code requirements. (Pl.'s Mot., Ex. 9, 2/11/10 letter.)

### e.  February 23, 2010 Planning Commission Meeting

On February 23, 2010, Defendant's Planning Commission held a meeting, and Plaintiff's Administrative Approval Request was once again addressed.  Plaintiff's counsel, Mr. Hyde, and Plaintiff attended and spoke at the meeting. (Def.'s Resp., Ex. 6, 2/23/10

Minutes at 2, 4.)  Plaintiff had submitted a detailed site plan as well as the actual building plans submitted by his engineer, Paul Clemente, showing 20 washing machines.  (*Id.* at 2-3.)  Plaintiff's attorney informed the Commission that there was ample parking, that Plaintiff had a lot of experience with commercial coin-operated laundromats, that each individual unit in this strip mall had its own water meter, that Plaintiff would have two water meters because he was combining two units, and that the existing water and sewer lines would not need to be expanded with Plaintiff's intended use.  (*Id.* at 3.)

Plaintiff's counsel was then asked if Plaintiff already had a permit to build out, and he replied "no."  (*Id.*)  When the same Commissioner asked if, besides doing the demolition, Plaintiff had done any installation, Plaintiff himself responded.  He replied that he was storing some machines on site but they were not hooked up.  The Commissioner then commented that Plaintiff had blocked the windows with paper, and Plaintiff also denied this. He said there was construction material up against the windows, but that was about it.  (*Id.* at 4.)  The Commissioner insisted that she had driven by the location and saw some paper on the windows.

Another Commissioner supported the statement that the windows had been blocked. In fact, she said this was done the day after she happened to be at the location looking in the windows and saw machines being installed.  (*Id.*)  Plaintiff again denied that any of the equipment that was stored at the location had been hooked up.  He denied that he was hiding anything.  He stressed that he was paying rent, that his application for a building permit had been pending for a few weeks, and he needed to do things to get his project in motion.  (*Id.*)  The Commissioner responded that, because Plaintiff was not new to the

16

laundromat business, he should have been aware that these things take time. She told him that, just because the process takes time, he could not ignore the rules. She informed him that she was "especially offended because on the 10th of February she drove by and looked in the windows, and the next day everything was papered . . . . The windows were blocked so that no one could see inside any more. That leads her to believe that there is some type of shenanigans going on. . . . they are putting in stuff before they got the approval." (*Id.* at 5.) Plaintiff responded that "he does have a demolition permit." (*Id.*) The Commissioner told Plaintiff that she saw men in there installing machines. (*Id.*) In response, Plaintiff told her that he did bring machines into the building, that he did not think his Administrative Approval Request would be a problem, that he was "not trying to jump ahead of anything," and apologized. (*Id.*)

The meeting continued with a discussion about the number of parking spaces Plaintiff's business would require, and Plaintiff's counsel's argument that the change in use for the leased space was insignificant and would not create a parking problem. The Commission discussed calculating parking spaces based on the number of machines Plaintiff's business planned to install, and a question arose about how that number was calculated. (*Id.* at 6-7.) Plaintiff's building engineer, Mr. Clemente, addressed those questions. He explained that only washing machines are counted and stated that water and sewage requirements are also based on the number of washing machines. (*Id.* at 7.) Because an issue remained open on how to calculate the number of parking spaces the new business would require under Defendant's ordinance, the Commission decided to table Plaintiff's Administrative Approval Request for up to two meetings so the issue could be

researched.  (*Id.* at 8.)  Before making the motion to table Plaintiff's Administrative Approval Request, Commissioner Priest commented that the Commission is not trying to stop Plaintiff's project.  Rather, it had to follow the Township's ordinance and needed to research whether "machine" means only washing machines.  (*Id.*)

Plaintiff wanted clarification about when his Request would next be considered  and reminded the Commission that there is a cost factor involved here.  He stated that, in other laundromat projects, he got a building permit in about 2 to 3 weeks, that this was taking over 6 weeks, and he had never encountered this type of delay before.  (*Id.* at 8-9.)  He emphasized that there is adequate parking at the site, that his attorney provided the Commission with all that was required, that they had shown that the prior users of the leased space had used more parking than his Laundromat will, that he had addressed every issue with respect to his project and would like the Commission to approve his plan so he could move forward before he goes out of business.  (*Id.* at 9.)

Commission members explained to Plaintiff that they asked for this information previously but this is the first time they were reviewing it.  In response to Plaintiff's statement that he had provided his site plan to Administrator Giese, Commissioner Ficht explained that "she was there the day that [Plaintiff] came to the Planning Department.  She was standing by the Supervisor's Office.  When [Plaintiff] was asked for the site plan he said 'my attorneys said I don't have to give you a site plan.  It's not required.'  When we got our piece of paper at the [February 9th] meeting it was just a square, and then [Plaintiff] came up with a site plan that he claimed he gave to the Building Department."  (*Id.*) Commissioner Ficht said she heard Plaintiff tell Ms. Giese that he did not have to furnish

18

a site plan. (*Id.*) Plaintiff denied all of this. His counsel, Mr. Hyde, "commented that he was at the counter too when this issue came up because he dealt with the Zoning Administrator and asked if they can avoid going to plan review if there are just incidental things. She [Ms. Giese] said no we prefer to have it go to plan review. [Plaintiff's Attorney] came over here and asked what we need. He was informed that they needed something to show the whole building. [Plaintiff] had a site plan from the owner. [Plaintiff's Attorney] instructed [Plaintiff] to just mark on [the owner's site plan] where his unit is going to be on that plan, and then somebody in the office said that they would copy it." (*Id.*) After these comments, the matter was closed, and the Commission moved on to other matters. (*Id.*)

### f.  February 24, 2010 Stop Work Order

On February 24, 2010, the day after the February 23, 2010 Planning Commission meeting, Defendant issued a Stop Work Order on Plaintiff's laundromat business because Plaintiff was not just doing demolition work, he was performing other work. Plaintiff had a permit to demolish an interior wall.[1]  He did not have an Interior Finish Permit. (Def.'s Resp., Ex. 8, 2/24/10 Stop Work Order.)  In his Affidavit, Code Enforcement Officer John St. Germaine explained that, as part of his duties, he routinely inspects sites to ensure that permit holders are acting within the scope of their building permits. (Def.'s Resp., Ex. 9, St. Germaine Aff. at ¶¶ 1, 2.) On February 24, 2010, he visited Plaintiff's business, The Laundry Stop, and "witnessed that interior walls were being erected and installed." (*Id.* at

---

[1]"A Demolition Permit allows the permit holder to perform demolition activities, including the deconstruction and removal of interior walls.  A Demolition Permit does not allow the permit holder to perform construction activities, including but not limited to the erection and installation of interior walls."  (Def.'s Resp., Ex. 9, J. St. Germaine Aff. at ¶¶ 3, 4.)

19

¶ 5.)  Because Plaintiff "had not been granted a permit for the activities being performed,

St. Germaine "confirmed with Building Official Shawn Shortt that a Stop Work Order should

be issued" and posted the Stop Work Order.  (*Id.* at ¶¶ 7, 8; Pl.'s Mot., Ex. 12, Shortt

10/5/11 Dep. at 47.)  The Stop Work Order precluded Plaintiff from performing interior

construction activities because his application for a building permit allowing Interior Finish

work had not  yet been approved.  (*Id.*)

### g.  Building Permit Application for Interior Finish Work - Discussion Re: Sewer and Water Fees and March 24, 2010 Stop Work Order Issued and Removed Same Day

In addition to his Administrative Approval Request, Plaintiff also had an application

pending for a building permit allowing him to do Interior Finish work at his laundry business.

Plaintiff was aware that, to obtain this permit, Defendant wanted him to pay water and

sewer fees of approximately $27,000.  At the February 9, 2010 Planning Commission

meeting, Plaintiff's business partner, Sanford Green, told the Commission that, as to the

engineer's statement about water and sewer fees, "[t]here is a set schedule of extra fees

that a Laundromat has to meet.  It is $27,000.00 [and t]hey have already agreed to pay it

per the existing schedule."  (Def.'s Resp., Ex. 5, 2/9/10 Minutes at 7.)

Plaintiff also met with Defendant's Superintendent of its Department of Public Works,

Joseph Gayeski, in February and March 2010 to discuss the water and tap fees associated

with his proposed laundromat.  (Def.'s Resp., Ex. 14, Gayeski Aff. at ¶ 5.)  As

Superintendent, Gayeski routinely calculates the required water and sewer tap fees that

may be associated with applications for building permits.  These fees are calculated by

20

applying the number of washing machines the applicant reports to the factors and fees established by the Township Board in the Code of Ordinances. This method was applied to Plaintiff's laundry business. Plaintiff reported 20 washing machines; and applying the Ordinance tap factors, his water privilege fee was $7,500.00 and his sewer privilege fee was $20,000.00, for a total of $27,500.00. (*Id.* at ¶¶ 2-4.)

On March 17, 2010, at Superintendent Gayeski's suggestion, Plaintiff's attorney, Roger Hyde, wrote to Defendant's attorneys about the water and sewer fees and seeking advice. (Def.'s Resp., Ex. 11, 3/17/10 letter.) He explained that the Township was requiring that the $27,500 in water and sewer privilege fees either be paid up front or through installments based upon a tax lien agreement with Plaintiff's landlord. The landlord, however, refused to sign the agreement. So, Plaintiff's counsel asked Superintendent Gayeski whether an installment payment agreement could be entered into just between the Plaintiff and the Township. Superintendent Gayeski had suggested that Plaintiff's counsel write to the Township's attorneys to see if this was possible. (*Id.*) Plaintiff's counsel did not challenge the imposition of water and sewer fees, only how payment was to be made, i.e., immediately or over time. (*Id.*) It was determined that the Township could not, under its ordinance, allow an arrangement for payment of the water and sewer fees over time without a lien on the property securing the debt.[2] (Def.'s Resp., Ex. 7, Pl.'s 12/9/11 Dep. at 65-66.)

---

[2]Section 64-233 of Defendant's Code of Ordinances grants the Township Board the authority to defer all or part of these fees. As a condition for deferment, the Township Board is authorized to require a mortgage on the subject property to secure the debt. (Def.'s Resp., Ex. 13, Section 64-233.)

21

On March 23, 2010, Defendant offered Plaintiff a debt service agreement obligating Plaintiff to pay the $27,500 water and sewer fees by March 26, 2010, but not encumbering the property. (Def.'s Resp., Ex. 12, Def.'s proposed agreement.) The proposed agreement also provided that Plaintiff agreed to hold the Township and its Department of Public Works "harmless of any legal fees by hardship" on his part and that "the Department of Public Works will have authority to issue a stop work order through the Township Building Department" if payment is not satisfied. (*Id.*)

As of the morning of March 24, 2010, Plaintiff had not paid the water and sewer tap fees required by Defendant's ordinance. (Gayeski Aff. at ¶ 6.) In addition, on the morning of March 24, 2010, Superintendent Gayeski witnessed construction activities at Plaintiff's laundromat even though Plaintiff did not have a permit for those construction activities. So, Superintendent Gayeski contacted Building Official Shortt about these facts. (*Id.* at ¶ 7.) As a result, Code Enforcement Officer Nancy Welsh posted a Stop Work Order at the site of Plaintiff's proposed laundry business with the added comment "Per D.P.W. requirements." (Pl.'s Mot., Ex. 13, 3/24/10 Stop Work Order.)

Plaintiff did not appeal the Stop Work Order or the water/sewer fee requirement. He did, however, on March 24, 2010, propose his own version of an agreement obligating him to pay the water and sewer tap fees. Plaintiff submitted that agreement with his signature. In it, similar to Defendant's proposed agreement, Plaintiff acknowledged that if his check did not clear or was returned NSF, he understood and agreed "that the Department of Public Works will have authority to issue a stop work order through" Defendant's Building Department. Plaintiff's proposal also stated that "Payment is made under protest – all

22

rights are reserved."  (Def.'s Resp., Ex. 15, Pl.'s 3/24/10 proposal.)

At about 3:43 in the afternoon on March 24, 2010, Plaintiff tendered payment for the water and sewer tap fees and building permit fees to Ellen Clark, Deputy Treasurer, Chesterfield Township, and Defendant Township immediately authorized Plaintiff's building permit for Interior Finish work, even though Plaintiff's check was post-dated for March 26, 2010.  (*Id.*, Ex. 16, Ellen Clark Aff. at ¶¶ 1-7; Ex. 17, Pl.'s check no. 3610.)

The Stop Work Order was issued in the morning of March 24, 2010, and Plaintiff was issued his building permit for Interior Finish work later that afternoon.

### h.  April 2010 Permits and May 2010 Temporary Certificate of Occupancy

Defendant issued additional permits to Plaintiff in connection with the construction of his laundromat.  A plumbing permit was issued on April 13, 2010; a mechanical permit was issued on April 16, 2010; a final inspection was completed on the demolition permit on May 4, 2010; a final inspection was completed on Plaintiff's sign permit on May 4, 2010; inspections on Plaintiff's mechanical and plumbing permits were conducted on May 4, 2010 but final inspections had not been completed; and on May 5, 2010, Defendant issued a Temporary Certificate of Occupancy for Plaintiff's laundromat after a final inspection on his building permit for Interior Finish work.  (Def.'s Resp., Ex. 18, permits, inspection records, and temporary C of O.)

### i.  Plaintiff's June 2011 Federal-Court Action

On June 13, 2011, Plaintiff filed this lawsuit in federal court asserting civil rights claims, including a claim for municipal liability, under 42 U.S.C. § 1983.

23

2.  **Parties' Arguments**

Plaintiff alleges that Defendant Township violated his procedural due process rights when it failed to provide him notice and an opportunity to be heard before it posted the February 24 and March 24, 2010 stop work orders.  Specifically, Plaintiff argues that (1) these procedural due process claims are ripe for adjudication; (2) his leasehold interest in the commercial space and his building permit allowing demolition work are constitutionally protected property interests; and (3) Michigan's Building Code Act, Mich. Comp. Laws § 125.1512(3),[3] required Defendant to provide him with notice and an opportunity to be heard before it deprived him of the use of his leased premises and the benefit of a building permit that allowed him to perform demolition work at the leased premises.

Defendant Township argues in response that (1) because Plaintiff failed to appeal either stop work order to Defendant's construction board of appeals, his procedural due process claims are not ripe for review; (2) even if ripe, Plaintiff did not have a building

---

[3]Michigan's Construction Code Act provides, in pertinent part, that:

(3) If construction is being undertaken contrary to a building permit, this act, or other applicable laws or ordinances, the enforcing agency shall give written notice to the holder of the building permit, or if a permit has not been issued then to the person doing the construction, notifying him of the violation of this act, or other applicable laws and ordinances, and to appear and show cause why the construction should not be stopped. . . .  If the holder of the permit or the person doing the construction fails to appear and show good cause within 1 full working day after notice is delivered, the enforcing agency shall cause a written order to stop construction to be posted on the premises. A person shall not continue, or cause or allow to be continued, construction in violation of a stop construction order, except with permission of the enforcing agency to abate the dangerous condition or remove the violation, or except by court order. . . .

Mich. Comp. Laws § 125.1512(3).

permit that allowed the interior finish construction work he was performing and thus had no constitutionally protected property interest to continue the construction work forbidden by the stop work orders; and (3) even if ripe and Plaintiff had a constitutionally protected property right deprived by the stop work orders, Plaintiff received the process he was due because he had notice and an opportunity to be heard before the stop work orders were posted at his leased premises and also had adequate post-deprivation remedies, i.e., the right to appeal the stop work orders to Defendant's construction board of appeals and then to state court – remedies of which Plaintiff failed to take advantage.

The Court now analyzes whether Plaintiff's procedural due process claims are ripe. It concludes that Plaintiff's claim as to the February 24, 2010 stop work order is ripe but the claim as to the March 24, 2010 stop work order is not because that claim is joined with a First Amendment retaliation claim.

### 3.  Procedural Due Process and the February 24, 2010 Stop Work Order

#### a.  Ripeness

Applying the relevant Sixth Circuit decisions discussed above, Plaintiff's procedural due process claim concerning the February 24, 2010 stop work order is ripe for review. There is no other constitutional claim tied to it.  So, this is the sort of purely procedural challenge for which the Sixth Circuit does not extend the finality requirement.  *See Insomnia, Inc.*, 278 F. App'x at 614; *Bigelow*, 970 F.2d at 159-60.

Because it is ripe, this Court now considers the remaining elements of Plaintiff's procedural due process claim; i.e., whether Plaintiff had a protected property interest that was deprived by the February 24, 2010 stop work order, and whether Plaintiff received the

25

process he was due under the Due Process Clause.

### b. Deprivation of Protected Property Interest

This Court concludes that, as of February 24, 2010, Plaintiff had a protected property interest in a building permit that allowed him to do demolition work on his leased premises but not construction work that would be allowed under the not-yet-granted Interior Finish permit. "Under Michigan law, the issuance of a valid building permit bestows a right on the property owner to begin and continue construction under the terms of the permit. . . ." *Paeth v. Worth Twp.*, 705 F. Supp. 2d 753, 769 (E.D. Mich. 2010) (emphasis added). Michigan law provides that construction activities may commence only after first obtaining a permit for a specified activity. *See* Mich. Comp. Laws § 125.1511 ("Except as otherwise provided in this act or the code, the construction or alteration of a building or structure shall not be commenced until a building permit has been issued."). At his deposition, Plaintiff conceded that the building permit for demolition work that he was granted on February 2, 2010 authorized him to do demolition work only. (Def.'s Resp. to Pl.'s Mot., Ex. 7, Pl.'s Dep. at 36, 38.)

### c. Plaintiff Received the Process He was Due

In his motion for partial summary judgment, Plaintiff relies on state-law procedures and argues that summary judgment should be granted because there is no genuine dispute as to any material fact on his procedural due process claim brought pursuant to 42 U.S.C. § 1983. This Court disagrees both on the law and the facts.

First, it is federal and not state law that determines whether Plaintiff's federal rights under the Due Process Clause were violated. "'Violation of a state's formal procedure . .

26

. does not in and of itself implicate constitutional due process concerns.'" *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001) (quoting *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996). *See also Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993) (observing that "[a] state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable."). Under federal constitutional law, "[t]he essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

The Sixth Circuit recently considered a claim similar to Plaintiff's in *Dubuc v. Twp. of Green Oak*, 406 F. App'x 983, 987 (6th Cir. 2011). In *Dubuc*, the plaintiffs claimed they were "deprived of a protected property interest in the non-conforming use of their property." *Id.* The *Dubuc* court began with a discussion of the essential elements of a procedural due process claim.

> To establish a procedural due process claim pursuant to § 1983, plaintiffs must establish three elements: (1) that they have a life, liberty or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest.

*Id.* (internal quotation marks and citation omitted). The court then assumed that the plaintiffs had been deprived of a constitutionally protected property interest and concluded that the process provided to the plaintiffs did not violate the due process clause. *Id.* In fact, the *Dubuc* court found that the plaintiffs had "received ample process." *Id.*

Similar to the plaintiffs in *Dubuc*, Plaintiff here had prior notice of the alleged

2:11-cv-12562-NGE-MKM   Doc # 57   Filed 05/16/12   Pg 28 of 53   Pg ID 1803

deprivation and an opportunity to be heard.  Plaintiff and his counsel both attended and had

an opportunity to be heard at the February 23, 2010 Planning Commission Meeting and

respond to the Commissioners' concerns that Plaintiff was performing construction activities

outside the scope of demolition work permitted under his February 1, 2010 building permit.

(Def.'s Resp., Ex. 6, 2/23/10 Minutes at 2-5.)

On February 24, 2010, the day after the February 23, 2010 Planning Commission

meeting, Defendant issued a Stop Work Order on Plaintiff's laundromat business because

Plaintiff was not just doing demolition work, he was performing other work.  Plaintiff had a

permit to demolish an interior wall.[4]  He did not have an Interior Finish Permit.  (Def.'s

Resp., Ex. 8, 2/24/10 Stop Work Order.)  In his Affidavit, Code Enforcement Officer John

St. Germaine explained that, as part of his duties, he routinely inspects sites to ensure that

permit holders are acting within the scope of their building permits.  (Def.'s Resp., Ex. 9,

St. Germaine Aff. at ¶¶ 1, 2.) He visited Plaintiff's business, The Laundry Stop, on February

24, 2010 and "witnessed that interior walls were being erected and installed." (*Id.* at ¶ 5.)

Because Plaintiff "had not been granted a permit for the activities being performed, St.

Germaine "confirmed with Building Official Shawn Shortt that a Stop Work Order should be

issued" and posted the Stop Work Order.  (*Id.* at ¶¶ 7, 8; Pl.'s Mot., Ex. 12, Shortt 10/5/11

Dep. at 47.)  The Stop Work Order precluded Plaintiff from performing interior construction

activities because his application for a building permit allowing Interior Finish work had not

---

[4]"A Demolition Permit allows the permit holder to perform demolition activities, including the deconstruction and removal of interior walls.  A Demolition Permit does not allow the permit holder to perform construction activities, including but not limited to the erection and installation of interior walls."  (Def.'s Resp., Ex. 9, J. St. Germaine Aff. at ¶¶ 3, 4.)

yet been approved.

That Building Officer Shortt testified that he personally did not notify Plaintiff or provide him with an opportunity to be heard before posting the February 24, 2010 stop work order does nothing to establish Plaintiff's procedural due process claims. As reflected in the February 23, 2010 minutes, before the February 24, 2010 stop work order was issued, Plaintiff had been warned not to exceed the scope of his building permit granting him authority to do demolition work; not interior construction work, and was provided a predeprivation opportunity to be heard. This is sufficient under prevailing Sixth Circuit law. For example, in *Hussein v. City of Perrysburg*, 617 F.3d 828, 832 (6th Cir. 2010), the Sixth Circuit held that there was no procedural due process violation where a stop work order was in effect precluding further construction on the plaintiffs' home but they proceeded to have asphalt laid on the driveway and defendant city officials ordered contractor to stop and threatened litigation. The *Hussein* court agreed with the plaintiffs that "typically, notice and an opportunity to be heard are required before depriving citizens of property interests." *Id.* Nonetheless, those requirements were satisfied here because "a state official [had] state[d] his view that a citizen's actions are in violation of the law and threaten[ed] litigation. . . . These actions are the provision of notice, and if the citizen does not comply with the official's demands, the threatened litigation will provide the opportunity to be heard." *Id.* The court rejected the plaintiffs' arguments that more was required under the Due Process Clause. "To demand notice before an official can inform citizens that they are in violation of the law would be to demand notice as a precondition of notice. The Constitution does not impose recursively impossible demands upon state officials who seek to enforce the

29

law." *Id.* Applying those principles here, before the stop work order was issued, Plaintiff

had notice that he was not allowed to perform construction activities outside the scope of

his building permit allowing demolition work. Defendant Township was not required to

provide additional notice that to do so would have consequences. Likewise, Plaintiff had

an opportunity to be heard at the predeprivation Planning Meeting and, as explained below,

if he had taken advantage of remedies available under Michigan law by appealing the stop

work order to Defendant's construction board of appeals, he would have suffered no injury

and would have had additional post-deprivation opportunities to be heard.

      As the Sixth Circuit explained in *Dubuc*:

> The predeprivation process need not always be elaborate, however; the amount
> of process required depends, in part, on the importance of the interests at stake.
> . . . Moreover, the sufficiency of predeprivation procedures must be considered
> in conjunction with the options for postdeprivation review; if elaborate procedures
> for postdeprivation review are in place, less elaborate predeprivation process
> may be required. In some cases, postdeprivation review may possibly be
> sufficient, and no predeprivation process is required.

*Dubuc*, 206 F. App'x at 987-88 (internal quotes and citations omitted).

      Plaintiff had the opportunity under Defendant Township's ordinance and Michigan's

Construction Code Act to appeal the stop work order to the construction board of appeals

and then to the Macomb County Circuit Court. *See* Twp. Code of Ordinances, § 14-814

(establishing entity);[5] Mich. Comp. Laws § 125.1517 (providing that, specific to stop

construction orders, "an appeal to a board of appeals . . . shall act as a stay upon an order,

determination, decision or action appealed from, unless the enforcing agency establishes

---

    [5]*See also* Pl.'s Mot., Ex. 21, Shortt 10/5/11 Dep. at 83, confirming that Defendant
Township has a Construction Board of Appeals.

that immediate enforcement . . . is necessary to avoid substantial peril to life or property."); Mich. Comp. Laws § 125.3607(1) (providing that "[a]ny party aggrieved by any order, determination, or decision of any officer, agency, board, commission, . . . or legislative body of any local unit of government . . . may obtain a review in the circuit court for the county in which the property is located."). More importantly, pursuant to the Michigan law, had Plaintiff appealed the stop work order, that appeal would have acted as a stay of the stop work orders and there would be no deprivation. Finally, similar to the plaintiffs in *Dubuc*, Plaintiff here "did not avail [himself] of [his postdeprivation] opportunities, and [he] should not be able to now use [his] inaction against [Defendant Township] in claiming a violation of due process. *Dubuc*, 206 F. App'x at 989 (citing and quoting with approval *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004) ("A party cannot create a due process claim by ignoring established procedures.")).[6]

The Court now analyzes Plaintiff's claim that his procedural due process rights were denied in connection with the March 24, 2010 stop work order.

### 4. Procedural Due Process and the March 24, 2010 Stop Work Order

### a. Ripeness

Plaintiff has clarified that, in addition to a procedural due process claim, he is alleging that his First Amendment rights were violated when Defendant issued the March 24, 2010 stop work order in retaliation for his protest of sewer and water tap fees that he claims have

---

[6]The same analysis and result applies to Plaintiff's claim that the February 24, 2010 stop work order deprived him of his constitutionally protected interest in the leased commercial space intended to house his laundry business.

subsequently been found to be an improper tax under Michigan's constitution.[7]  (Pl.'s Resp. at 1.)  So, applying the Sixth Circuit precedent discussed above, because Plaintiff is not asserting solely a procedural due process claim in connection with the March 24, 2010 stop work order, he was required to satisfy the finality requirement for both his procedural due process and First Amendment retaliation claims, and he failed to do so.  *See Insomnia, Inc.*, 278 F. App'x at 614; *Bigelow*, 970 F.2d at 159-160.  Plaintiff's procedural due process claim is not ripe and must be dismissed.  Plaintiff is not allowed to circumvent the ripeness requirement for his First Amendment retaliation claim by adding a procedural due process claim to his complaint.

As discussed above, Plaintiff had the opportunity under Defendant Township's ordinance and Michigan's Construction Code Act to appeal the March 24, 2010 stop work order to the construction board of appeals and then to the Macomb County Circuit Court. More importantly, pursuant to Michigan law, had Plaintiff appealed the stop work order, that appeal would have acted as a stay that would remain in effect unless Defendant Township was able to establish that immediate enforcement was "necessary to avoid substantial peril to life or property."  Mich. Comp. Laws § 125.1517.

---

[7]Plaintiff's argument that a recent state circuit court decision recently held that Defendant's sewer and tap fees are unconstitutional under Michigan law in all circumstances is overstated. *See Macomb County v. Fox LLC*, No. 2011-2208-CH, 3/14/12 Opin. (Pl.'s Resp., Ex. 7.)  In that foreclosure action, the state court did not address whether Defendant's water and sewer tap fees were facially unconstitutional.  Rather, it addressed an as-applied challenge and found that Defendant's assessment of these fees violated the Headlee Amendment to Michigan's constitution, under the circumstances where an existing restaurant sought a building permit to simply expand (as opposed to a permit that involved a different use of the property and increased water and sewage useage).

### b.  Plaintiff Received the Process He Was Due

Even if Plaintiff's procedural due process claim was ripe for adjudication and assuming that Plaintiff was deprived of a protected property right, this Court concludes that Defendant is entitled to summary judgment on Plaintiff's procedural due process claim associated with the March 24, 2010 stop work order because he received all the process he was due.[8]

Similar to the issuance of the earlier stop work order, Plaintiff had pre-deprivation notice and opportunities to be heard before the March 24, 2010 stop work order was issued and post-deprivation remedies of which he failed to take advantage.  Plaintiff had ample notice from the February 23, 2010 Planning Commission meeting that he should not exceed the scope of his building permit allowing demolition work and an opportunity to be heard.  In light of the earlier stop work order, Plaintiff also had notice that Defendant would issue a stop work order if he exceeded the scope of his permit that allowed demolition, not construction activities.

Plaintiff also had ample notice and an opportunity to be heard on his application for a building permit allowing interior finish work.  In February and March 2010, Plaintiff met with Defendant's Superintendent of its Department of Public Works, Joseph Gayeski, and discussed the water and sewer tap fees associated with that application, Plaintiff voiced his objection that the fees were too expensive, and unsuccessfully attempted to negotiate an agreement that would allow him to pay the fees over time. (Gayeski Aff. at ¶ 5; Def.'s Mot., Ex. 1, Daley 12/9/11 Dep. at 65-66; Ex. 18, Gayeski 11/22/11 Dep. at 13-15; Ex. 19,

---

[8]The same analysis and result apply to Plaintiff's alleged deprivation of a protected property interest in his leased premises and in his building permit allowing demolition work.

3/17/10 ltr. from Pl.'s counsel to Def.'s counsel; Def.'s Mot., Exs. 20 and 22.)

On the morning of March 24, 2010, before Plaintiff was issued a building permit for Interior Finish work, Superintendent Gayeski witnessed construction activities at the leased commercial space intended to house Plaintiff's laundromat, and a stop work order was posted at the site.  (Gayeski Aff. at ¶¶ 6, 7.)  Later that afternoon, Plaintiff tendered payment for the water and sewer fees, along with building permit fees, and Defendant Township immediately authorized the building permit for Interior Finish work, even though Plaintiff's check was post-dated for March 26, 2010.  (Def.'s Mot. Ex. 16, Ellen Clark Aff. at ¶¶ 1-7; Ex. 17, Pl.'s check no. 3610.)

As discussed above, Plaintiff also had the opportunity for post-deprivation review. Rather than paying the sewer and water fees "under protest," Plaintiff had the opportunity to appeal the March 24, 2010 stop work order.  That appeal would have stayed enforcement of the stop work order and allowed Plaintiff another opportunity to protest the water and sewer fees.  Plaintiff did not avail himself of his post-deprivation opportunities and thus cannot now use his inaction against Defendant Township to claim a due process violation. *Dubuc*, 206 F. App'x at 989.

The Court now addresses Plaintiff's First Amendment retaliation claim asserted in connection with the March 24, 2010 stop work order.

## 5.  First Amendment Retaliation Claim and March 24, 2010 Stop Work Order

### a.  Ripeness

Plaintiff claims that his First Amendment rights were violated when Defendant issued

34

the March 24, 2010 stop work order in retaliation for his protected speech – his protest of sewer and water tap fees. This Court concludes that this claim also lacks ripeness. The Sixth Circuit's decision in *Insomnia, Inc.* counsels this Court's conclusion. In *Insomnia, Inc.*, the plaintiffs appealed the district court's decision dismissing their First Amendment claim for lack of ripeness. Affirming the district court, the Sixth Circuit rejected the plaintiffs' argument "that, in the First Amendment context, there is no finality requirement; rather, an injury to land use becomes legally cognizable as soon as the adverse governmental decision is made." *Insomnia, Inc.*, 278 F. App'x at 612. In doing so, it observed that the Second Circuit had recently departed from its decision in *Dougherty v. Town of North Hempstead Board of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002), and applied the finality requirement to First Amendment retaliation claims. *Id.* at 614-15 (citing *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005)).

The *Insomnia, Inc.* court observed that the Second Circuit conducts a two-part analysis when determining whether a plaintiff is "subject to the finality requirement prior to federal review of their claims." *Id.* at 615. First, the court asks "'whether the [plaintiffs] experienced an immediate injury as a result of [the defendant's] actions and (2) whether requiring the [plaintiffs] to pursue additional administrative remedies would further define their alleged injuries.'" *Id.* (quoting *Murphy*, 402 F.3d at 351). It further observed that, as to the first prong, the *Murphy* court "found that the plaintiffs did not suffer an immediate injury because, if they had chosen to appeal the cease and desist order to the zoning board of appeals, the effect would have been to stay the enforcement of the order." *Id.* As to the second prong, the *Murphy* court "concluded that 'the resolution of the constitutional and

35

statutory claims we are asked to consider hinge on factual circumstances not yet fully developed.'" *Id.* (quoting *Murphy*, 402 F.3d at 351). The *Murphy* court then concluded that, because the plaintiffs failed to satisfy the finality requirement, the court "lacked jurisdiction over their claims." *Id.*

Accepting and applying the Second Circuit's two-part analysis from *Murphy*, the *Insomnia, Inc.* court found that the plaintiffs in that case had "not suffered an immediate injury as a result of Defendant's actions" because if they had followed the administrative avenues available to them, "there is a chance that their proposal [would] be approved" and they would get the result they desired. *Id.* "Such an outcome would discharge any claims of First Amendment retaliation and obviate the need for federal review. If, however, Plaintiffs' renewed plan . . . is rejected, this outcome [would] further define the contours of Plaintiffs' claim of First Amendment retaliation." *Id.* at 615-16. Thus, the *Insomnia, Inc.* court concluded, "[t]aken together, these two prongs indicate that the district court acted properly in dismissing Plaintiffs' claim as premature." *Id.* at 616. The court also observed that this result promotes "three of the four policy considerations the *Murphy* Court outlined as underlying the finality requirement." *Id.* Specifically, it promotes the policies of (1) ensuring "the development of a full record;" (2) providing the plaintiffs with the opportunity to obtain "the relief they seek without requiring judicial entanglement in constitutional disputes;" and (3) showing "respect for federalism principles by recognizing that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Id.* (internal quotation marks and citation omitted).

The same analysis and result apply here. Like the plaintiffs in *Insomnia, Inc.* and

*Murphy*, Plaintiff did not suffer an immediate injury because, if he had chosen to appeal the March 24, 2010 stop work order to Defendant's construction board of appeals, the effect would have been to stay the enforcement of that order. Moreover, like the plaintiff in *Insomnia, Inc.*, if Plaintiff here had followed the administrative avenues available to him, "there is a chance" that he would have been successful on his objections to the water and sewer fees he paid in connection with the approval of his Interior Finish permit and he would get the result he desired. "Such an outcome would discharge any claims of First Amendment retaliation and obviate the need for federal review. If, however, [Plaintiff did not get the result he wanted], this outcome [would] further define the contours of [his] claim of First Amendment retaliation." *Id.* at 615-16.

### b. First Amendment Retaliation for Water/Sewer Fee Protest Not Established

Even if Plaintiff's First Amendment retaliation claim were ripe and his protests over the water and sewer tap fees were constitutionally protected speech, he has not shown that this protected speech was a "motivating factor" in the issuance of the March 24, 2010 stop work order. This is an essential element of a First Amendment retaliation claim. *See Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004).

Plaintiff alleges that the March 24, 2010 stop work order was posted because he refused Defendant Township's demands to sign an agreement requiring him to pay the water and sewer fees. But, Plaintiff never signed any agreement. He did, however, pay the required water and sewer fees, was issued a building permit allowing Interior Finish work, and the stop work order was removed that same day. Moreover, Plaintiff presents no evidence refuting Superintendent Gayeski's testimony that the stop work order was

issued because Gayeski had witnessed construction activities at Plaintiff's laundromat even though Plaintiff had not yet received a permit allowing those construction activities. Likewise, he presents no evidence to refute Mr. Gayeski's testimony that he has never had any animosity towards Plaintiff and none of his actions were motivated by animosity over any of Plaintiff's challenges.  (Def.'s Mot., Ex. 21, Gayeski Aff. at ¶¶ 7, 8.)  Contrary to Plaintiff's arguments here, no reasonable juror could infer from these facts and this unchallenged evidence that Defendant issued the March 24, 2010 stop work order to retaliate against Plaintiff for protesting the water and sewer fees or for refusing to sign an agreement to pay those fees in full.

The Court now turns to Plaintiff's constitutional claims regarding his home; specifically, the delay in the issuance of a final Certificate of Occupancy from the April 14, 2011 date he requested it until he got it on January 2, 2012.

### C.  Plaintiff's Home - Constitutional Claims

On March 15, 2011, the state trial court reversed the ZBA's June 9, 2010 and October 13, 2010 decisions finding that Plaintiff's 2007 revised plans for his garage failed to conform to Zoning Ordinance § 76-331(a)(2)(a).  *See Daley III.*

Plaintiff filed this lawsuit on June 13, 2011, alleging civil rights claims under 42 U.S.C. § 1983.  Specifically, with regard to his home, Plaintiff asserts three constitutional claims: (1) a First Amendment retaliation claim alleging that, despite his compliance with all zoning and building code ordinances, Defendant refused to timely issue a final Certificate of Occupancy because he filed the state-court appeal that generated the March 15, 2011 decision; (2) an Equal Protection claim alleging that Defendant selectively enforced its

38

zoning and building ordinances against him because he filed the state-court appeal that generated the March 15, 2011 decision; and (3) a Substantive Due Process claim alleging that Defendant's refusal to timely issue a final Certificate of Occupancy was arbitrary and capricious and explained only by Defendant's motive to retaliate against him for filing the state-court action that resulted in the March 15, 2011 decision.   (Pl.'s Resp. at 1, 15, 16, 17.)

### 1.  Background Facts

Plaintiff concedes that none of his constitutional claims rely on factual matters occurring before June 29, 2009, the date the Michigan Court of Appeals issued its decision in Plaintiff's second state-court action (*Daley II*).  (Pl.'s Resp. at 13-14.)[9]

### a.  June 29, 2009 - Decision by Michigan Court of Appeals (*Daley II*)

In *Daley II*, the Michigan Court of Appeals affirmed the trial court's dismissal of Plaintiff's claims.  It held that Plaintiff should have appealed the denial of his 2007 revised garage plans that included a craft room  to Defendant's ZBA, not its construction board of appeals, because those plans "could rebut the presumption in the first ZBA decision that two sixteen-foot garage doors means a four-car garage."  *Daley II*, 2009 WL 1830728 at *2.  The *Daley II* court also rejected Plaintiff's argument that any appeal would be futile because the ZBA was biased against him.  "Without giving the ZBA a chance to make a

---

[9]In light of this admission, it is unnecessary for the Court to address Defendant's argument that application of the *res judicata* doctrine limits Plaintiff's claims to events that occurred after the Michigan Court of Appeals' June 29, 2009 decision in *Daley II*.  (Def.'s Mot. at 13-14.)  Plaintiff concedes that his claims are based on facts arising after June 29, 2009.

final decision, it is impossible to determine that the ZBA is biased against plaintiff." *Id.* The Michigan Court of Appeals further held that "Plaintiff must appeal the township's decision to the ZBA before he can bring his 42 USC 1983 claim." *Id.*

### b. Plaintiff's Appeal to ZBA

In May 2010, almost a year after the Michigan Court of Appeals' June 29, 2009 decision in *Daley II*, Plaintiff sought a hearing before Defendant's ZBA. (Pl.'s Am. Compl. at ¶ 54 and Ex. 17, Pl.'s Application.) A hearing was held on June 9, 2010. (Pl.'s Resp., Ex. 16, ZBA 6/9/10 minutes.) Plaintiff's counsel, Mr. Hyde, argued that, consistent with what the *Daley II* court said, the inclusion of a 100-foot craft room in the 2007 revised plans rebuts the presumption that two 16-foot garage doors means a four-car garage and the need for Plaintiff to seek a variance. (*Id.* at 2-3, 5.) Building Official Shortt testified that, if Plaintiff's design was for three cars and a craft room, that craft room would have to be a habitable room with lights, electrical outlets, windows, heat, insulation, 8% glass, a fire-rated door, and a separation from the garage, and Plaintiff's 2007 revised plans did not include any of this. (*Id.* at 3.) After considerably more discussion, the ZBA denied Plaintiff's appeal. *Id.* at 8.

### c. Plaintiff's Appeal of ZBA decision to State Court

On July 6, 2010, Plaintiff filed his third state-court lawsuit. *Daley v. Charter Twp. of Chesterfield Zoning Board of Appeals (Daley III)*, Macomb County Circuit Court No. 2010-2795-AV. "Pursuant to a September 8, 2010 stipulated order, the matter was remanded to the ZBA to assure the parties that the ZBA members had before them a full and complete copy of the building department file for review prior to making a decision." *Id.*,

40

March 15, 2011 Slip Op. at 2.

On October 13, 2010, Defendant's ZBA once again considered and denied Plaintiff's appeal. It concluded that Plaintiff's 2007 revised plans were not in compliance with Defendant's zoning ordinance because Plaintiff's plans did not show that the garage craft room satisfied the building requirements for a habitable room. (Pl.'s Resp., Ex. 17, 10/13/10 ZBA minutes at 2-8.) After the ZBA's denial of Plaintiff's appeal, Plaintiff returned to state court to appeal the ZBA's decision.

### d. State Court Decision Reversing ZBA decision

On March 15, 2011, the Macomb County Circuit Court reversed the ZBA's June 9, 2010 and October 13, 2010 decisions denying Plaintiff's 2007 revised plan for his garage that included a craft room. *Daley III*, Macomb County Circuit Court No. 2010-2795-AV, March 15, 2011 Slip Op. at 5. The *Daley III* court agreed with Plaintiff's argument that "the ZBA erred by deciding the matter as a construction issue" rather than a zoning issue. *Id.* at 2. "Since the revised plan shows that the subject space can no longer accommodate four cars and since it does not exceed the maximum allowed footage, the ZBA's June 9, 2010 and October 13, 2010 denials of [Plaintiff]'s revised plan was contrary to the ordinance, not supported by the evidence, and amounted to an abuse of discretion." *Id.* at 5. The *Daley III* court cautioned, however, that its ruling "does not suggest that [Plaintiff] does not have to comply with all applicable construction code requirements." *Id.* at 5 n.3. It found only that "a zoning issue should not be confused with a construction code issue." *Id.*

### e. Plaintiff's and Defendant's Post-3/15/11 Communications Re:

41

**Final Certificate of Occupancy on Plaintiff's Home and Attached Garage**

On April 14, 2011, Plaintiff faxed a letter to Mr. Shortt at Defendant's Building Department asking him to "review and approve the plans with the revision, and advise" him "of any requirements on the permit" so he could "complete construction and obtain a final certificate of occupancy." (Def.'s Mot., Ex. 8, faxed letter.)

On April 18, 2011, Mr. Shortt called Plaintiff and told him to submit plans for a craft room, and Plaintiff responded that he was revising plans for submission. (*Id.*) Mr. Shortt also testified that, when Plaintiff brought the March 15, 2011 court decision to the Building Department and sought a building permit for the garage craft room, Shortt spoke with Plaintiff. Shortt told Plaintiff that Defendant was considering a new zoning ordinance that would allow four-car garages and suggested that Plaintiff hold-off and let the new zoning ordinance be adopted and then proceed with his original four-car garage plan. Shortt was aware that Plaintiff originally sought a variance for a four-car garage and, in fact, Shortt was the one who suggested to Plaintiff, after his original garage plan was denied, to revise his plans to include a craft room. Shortt explained that he had supported Plaintiff all along in his efforts to complete his garage, but it was Plaintiff's neighbors who opposed his garage plan with two 16-foot garage doors. (Pl.'s Resp., Ex. 21, Shortt 10/05/11 Dep. at 74-76.)

Plaintiff did not contact Defendant to schedule a Final Inspection on his home and attached garage with the craft/storage room. *See* Defendant's Zoning Ordinance § 76-

655.[10]  (Def.'s Mot., Ex. 10.)

Shortt believed that Plaintiff's inaction was because he agreed with Shortt's suggestion that Plaintiff wait until the new zoning ordinance allowing four-car garages was approved.  (Shortt 10/05/11 Dep. at 74-76.)

### f.  Plaintiff's June 13, 2011 Federal Court Action

On June 13, 2011, Plaintiff filed this lawsuit in federal court asserting civil rights claims, including a claim for municipal liability, under 42 U.S.C. § 1983.

### g.  Parties' Conduct After Federal-Court Action Filed

On September 9, 2011, the amendment to Defendant's Zoning Ordinance, § 76-331, became effective, allowing a four-car garage on lots the size of Plaintiff's residential lot.

Subsequently, Plaintiff and Defendant corresponded with each other.

On October 17, 2011, Mr. Shortt wrote to Plaintiff reminding him that he had not responded to Mr. Short's September 23, 2011 letter and asking Plaintiff to let him know how he would like to proceed with his garage.  Mr. Shortt also enclosed a Punch List previously provided to Plaintiff from the final inspection of his home on March 9, 2005 and asked Plaintiff to contact Shortt if he had any questions about it.  (Def.'s Mot, Ex. 11,

---

[10]Section 76-655, titled "Final Inspection," provides that:

> The recipient of any building permit for the construction, erection, alteration, repair or moving of any building, structure or part thereof, shall notify the building administrator immediately upon the completion of the work authorized by such permit for a final inspection.

Chesterfield Township, Zoning Ordinance, § 76-655 (emphasis added).

10/17/11 letter.)

On October 18, 2011, Plaintiff responded to Mr. Shortt's letter and requested "a final inspection related to singular criteria you noted in your deposition – Mr. Shortt's deposition was taken on October 5, 2011 – so that I can secure a certificate of occupancy for my home." (*Id.*, 10/18/11 letter.)

Mr. Shortt responded to Plaintiff's October 18th letter, referenced the two applications Plaintiff had pending in connection with construction activity at his home, assured Plaintiff that Defendant's inspection of his home has nothing to do with his pending lawsuit, and that correspondence from Shortt should not be considered "as any sort of acknowledgment or admission of any sort of 'error,' nor is it an offer to compromise." (*Id.*, undated letter.) Rather, Shortt clarified, "because the Township's newly amended ordinance will allow you to construct your garage either with the craft room or without, I am once again requesting that you identify which of these plans you wish to pursue so that a final inspection can be scheduled." (*Id.*)

Plaintiff responded on November 25, 2011.  He wrote that he was confused because, from Mr. Shortt's recent deposition testimony, Plaintiff believed that all he had to do to get a certificate of occupancy was to request an inspection based on the punch list provided to him in 2005, and Plaintiff had completed all the items on that list.  In response to Mr. Shortt's inquiry as to which of his garage plans he wished to have considered for the final inspection, Plaintiff specified that Mr. Shortt should "refer to the most recent plans" Plaintiff had submitted to Shortt's office, and requested a final inspection as soon as possible. (*Id.*, 11/25/11 letter marked "rec'd 12-1-11".)

44

At Plaintiff's deposition on December 9, 2011, when Plaintiff was asked whether he wished to have his garage inspected as a four-car garage or as a three-car garage with a craft/storage room, Plaintiff indicated that his wife liked the room in the garage because it allowed her to store a lot of stuff in there.  (Def.'s Mot., Ex. 1, Pl.'s 12/09/11 Dep. at 30.)

On December 15, 2011, Shortt wrote to Plaintiff.  He explained that, although the two spoke last week about scheduling the final inspection under Plaintiff's most recent plans for the garage, Plaintiff had not called Shortt with a date and time for the inspection.  Since Plaintiff had not called, Shortt informed Plaintiff that he was scheduling the final inspection for Wednesday, December 28, 2011 at 10:00 a.m.  (*Id.*, Ex. 11, 12/15/11 ltr.)

On December 28, 2011, the final inspection was conducted.  Plaintiff's home passed the inspection, and on January 2, 2012, a final Certificate of Occupancy was issued.  (Def.'s Mot., Ex. 12, 12/28/11 Twp. Note; Ex. 13, 1/2/12 C of O.)

### 2.  Parties' Arguments

Defendant's motion argues that Plaintiff's constitutional claims concerning the Certificate of Occupancy on his home are not ripe; and even if ripe, should be dismissed. Specifically, Defendant argues that (1) Plaintiff's Substantive Due Process claim should be dismissed because (a) the same actions that he alleges give rise to this claim also give rise to his Equal Protection and First Amendment retaliation claims, and (b) its actions were not arbitrary and capricious; (2) Plaintiff cannot establish an Equal Protection selective enforcement claim because he has not presented evidence showing that he was treated less favorably that other similarly situated individuals because of his constitutionally protected speech.  Plaintiff responds that (1) his claims are ripe; (2) Defendant's refusal to

45

timely issue the final Certificate of Occupancy on his home despite his compliance with all required ordinances is sufficient evidence to defeat summary judgment on his Substantive Due Process, Equal Protection, and First Amendment retaliation claims.

This Court first examines the ripeness issue.

### 3.   Analysis

### a.   Ripeness

On June 13, 2011, when this lawsuit was filed, Plaintiff's § 1983 claims concerning the denial of a final Certificate of Occupancy for his home were not ripe.  Plaintiff argues that Defendant's failure to act within five days of his April 14, 2011 written request for a final Certificate of Occupancy on his home constitutes a denial under Defendant's Ordinance § 76-654(6),[11] and Michigan's Building Code, Mich. Comp. Laws § 125.1513.[12]  Plaintiff,

---

[11]Section 76-654(6), titled "Application," provides that:

> Certificates of occupancy shall be applied for in writing to the building administrator coincidentally with application for building permits.   The certificate of occupancy shall be issued within five days after notification of completion of the building, if it is found that the building or structure, or part thereof, or the use of the land is in accordance with the provisions of this chapter.  If such certificate is refused for cause, the applicant shall be notified of such refusal and the cause thereof within the aforesaid five-day period.

(emphasis added).


[12]Mich. Comp. Laws § 125.1513 provides in pertinent part that:

A certificate of use and occupancy shall be issued by the enforcing agency when the work covered by a building permit has been completed in accordance with the permit, the code or other applicable laws and ordinances.  On request of a holder of a building permit the enforcing agency

46

however, never appealed Defendant's alleged inaction or constructive denial to the construction board of appeals as permitted under Defendant's Ordinance, Section 14-814 (establishing entity),[13] and Mich. Comp. Laws § 125.1514(1) (establishing entity and providing for administrative appeals).[14]

Applying the ripeness principles adopted by the Sixth Circuit, none of Plaintiff's constitutional claims arising out of the delayed issuance of his final Certificate of

---

> may issue a temporary certificate of use and occupancy for a building or structure, or part thereof, before the entire work covered by the building permit has been completed, if the parts of the building or structure to be covered by the certificate may be occupied before completion of all the work in accordance with the permit, the code and other applicable laws and ordinances, without endangering the health or safety of the occupants or users. <u>When a building or structure is entitled thereto, the enforcing agency shall issue a certificate of use and occupancy within 5 business days after receipt of a written application therefor on a form to be prescribed by the enforcing agency and payment of the fee to be established by it.</u> The certificate of use and occupancy shall certify that the building or structure has been constructed in accordance with the building permit, the code and other applicable laws and ordinances. . . . The enforcing agency shall give the owner of the building or structure or his agent at least 12 hours' notice of the time of any final inspection, by the enforcing agency of the work covered by the building permit pursuant to the application for a certificate of use and occupancy.

(emphasis added).

[13]*See also* Pl.'s Mot., Ex. 21, Shortt 10/5/11 Dep. at 83, confirming that Defendant Township has a Construction Board of Appeals.

[14]Mich. Comp. Laws § 125.1514(1) provides, in pertinent part, that "[i]f an enforcing agency refuses to grant an application for a building permit, or <u>if the enforcing agency makes any other decision</u> pursuant or related to this act, or the code, an interested person . . . may appeal in writing to the board of appeals." (Emphasis added). It also provides that "[t]he board of appeals shall hear the appeal and render and file its decision with a statement of reasons for the decision with the enforcing agency from whom the appeal was taken not more than 30 days after submission of the appeal." *Id.* If the construction board of appeals fails to render a timely decision, its failure is deemed to be "a denial of the appeal," and allows the aggrieved party to file "an appeal to the commission." *Id.*

Occupancy were ripe when brought.  By filing civil rights claims in this Court, Plaintiff precluded the development of a full administrative record and frustrated the policies underlying the finality requirement.  *See Dubuc*, 406 F. App'x at 990, n.9.  Through premature adjudication, Plaintiff has entangled the Court "in abstract disagreements." *Insomnia, Inc.*, 278 F. App'x at 612.

Applying the analysis adopted in *Insomnia, Inc.*, this Court concludes that at the time Plaintiff filed suit, he had not suffered an immediate injury.  Similar to the stop work orders discussed above, if he had chosen to appeal the constructive denial of his request for a final Certificate of Occupancy, that appeal would have operated as an immediate stay.  *See* Mich. Comp. Laws § 125.1517.[15]  More importantly, if Plaintiff had pursued the administrative avenues available to him, any confusion over his design choice for his garage or the need for an inspection of his home based on a 2005 punch list and inspection of his garage based on his design choice would likely have been resolved more quickly. If Plaintiff had pursued the administrative avenues available to him, there is a possibility that there would be little, if any, delay between his April 14, 2011 request and the issuance of a final Certificate of Occupancy.  "Such an outcome would discharge any claims of First Amendment retaliation and obviate the need for federal review."  *Insomnia, Inc.*, 278 F. App'x at 615-16.  And, if Plaintiff had pursued the administrative avenues available to him and still was unsuccessful in his efforts to obtain a final Certificate of Occupation, "this

---

[15]Another Michigan statute, Mich. Comp. Laws § 125.1514(1), requires a construction board of appeals to render a decision within 30 days.  If it fails to do so, that failure is deemed a denial that would triggers the right to file another administrative appeal. *Id.*  Yet another Michigan statute, Mich. Comp. Laws § 125.3607, provided Plaintiff with the opportunity to file suit in state court and obtain further review.

48

outcome [would] further define the contours" of his First Amendment retaliation claim.  *Id.*
The same is true of Plaintiff's Equal Protection and Substantive Due Process claims
because each is grounded on the same allegations of Defendant's retaliatory motive.
Moreover, dismissal of Plaintiff's constitutional claims for lack of ripeness would have
promoted the policies underlying the Sixth Circuit's finality requirement by ensuring "the
development of a full record;" providing Plaintiff with the opportunity to obtain the relief he
sought "without requiring judicial entanglement in constitutional disputes;" and showing
"respect for federalism principles by recognizing that land use disputes are uniquely matters
of local concern more aptly suited for local resolution."  *Id.* at 616 (internal quotation marks
and citation omitted).

### b.  Plaintiff Cannot Defeat Summary Judgment

Plaintiff's constitutional claims were not challenged on ripeness grounds shortly after
this action was filed, and the matter has proceeded to the point where Plaintiff ultimately
obtained the final Certificate of Occupancy he sought.  Nonetheless, even if this Court were
to consider Plaintiff's constitutional claims ripe for adjudication, Plaintiff cannot defeat
Defendant's motion for summary judgment for a number of reasons.  Primarily, Plaintiff's
claims fail because he presents no evidence showing that he suffered a constitutional injury
that resulted from Defendant's motive to retaliate against him for engaging in
constitutionally protected activity.  More specific reasons follow.

First, despite Plaintiff's arguments to the contrary, the trial court's decision in *Daley*
*III* did not mandate that Defendant simply carry out the ministerial task of issuing a final
Certificate of Occupancy.  As discussed above, the *Daley III* decision held that the ZBA

49

erred when it determined that Plaintiff's 2007 revised plans with the craft room was contrary to Defendant's zoning ordinance governing attached garages.  So, Plaintiff is correct in arguing that there would be no justification for delay if it were based on that zoning ordinance.  That, however, is not what concerned Defendant's Building Official Shortt. Before he could issue a final Certificate of Occupancy on Plaintiff's home, he had to inspect and ensure that both the home and the attached garage satisfied all applicable construction code requirements.  As the *Daley III* court clarified, its ruling did "not suggest that [Plaintiff] does not have to comply with all applicable construction code requirements."  *Daley III*, Macomb County Circuit Court Case No. 2010-2795-AV, March 15, 2011 Slip Op. at 5 n.3.


Second, Plaintiff presents no evidence to refute Defendant's evidence that the delay in issuing Plaintiff's final Certificate of Occupancy was not based on a motive to retaliate. He presents no evidence that refutes Building Official Shortt's testimony that, rather than animosity, he had supported Plaintiff all along in his efforts to complete his garage. Likewise, he presents nothing that refutes Defendant's evidence showing that the delay resulted first from a misunderstanding on the part of Building Official Shortt about Plaintiff's design choice and then from Plaintiff's misunderstanding that all that was required was an inspection of his home based on a 2005 punch list and finally from Plaintiff's neglect in arranging a date for the final inspection.  (Pl.'s Resp., Ex. 21, Shortt Dep. at 74-76; Def.'s Mot., Ex. 11, 10/17/11 ltr. from Shortt to Pl. and Pl.'s 10/18/11 resp.; Shortt's undated ltr. to Pl. and Pl.'s 11/25/11 resp; Def.'s Mot., Ex. 1, Pl.'s Dep. at 30; Def.'s Mot., Ex. 11, Shortt's 12/15/11 ltr. to Pl.; Def.'s Mot., Ex. 12, 12/28/11 Twp. Note.)

Third, Plaintiff, who failed to pursue the administrative avenues available to him, cannot now use his inaction and resulting delay against Defendant as evidence of Defendant's desire to retaliate against him for filing that zoning appeal. *See Dubuc*, 206 F. App'x at 989 (making this observation with regard to a procedural due process claim). Because of the ambiguity created by Plaintiff's inaction, no reasonable juror could plausibly infer from the facts presented here that any delay in issuing Plaintiff's final Certificate of Occupancy was motivated by Defendant's intent to retaliate against him for filing the zoning appeal in *Daley III*.

In sum, absent evidence of retaliation, Plaintiff's First Amendment retaliation claim fails. *See Tucker*, 388 F.3d at 200. Plaintiff's Equal Protection claim also fails for this and another reason. Plaintiff has not come forward with evidence that similarly-situated residents were treated differently than him, and this is an essential element of his Equal Protection claim. *See Dubuc v. Green Oak Twp.*, 958 F. Supp. 1231, 1238 (E.D. Mich. 1997). Plaintiff's Substantive Due Process claim fails for yet another reason. Because Plaintiff's First Amendment retaliation and Equal Protection claims provide "an explicit textual source of constitutional protection" against Defendant's allegedly retaliatory behavior, these claims and "not the more generalized notion of substantive due process, must be the guide" for analyzing Plaintiff's claims.[16] *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, ___ U.S. ___, 130 S. Ct. 2592, 2606 (2010) ("Where a particular Amendment provides an explicit textual source of constitutional protection against

---

[16]Moreover, based on the unrefuted evidence presented by Defendant, this Court concludes that its conduct with regard to issuing Plaintiff's final Certificate of Occupancy was not arbitrary and capricious.

a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks and citations omitted)).

For the above-stated reasons, Defendant's motion for summary judgment is granted as to each of Plaintiff's constitutional claims. The Court now addresses Plaintiff's claim of municipal liability.[17]

### D.  Plaintiff's Municipal Liability Claim Fails

In light of this Court's conclusion that Defendant is entitled to summary judgment on Plaintiff's constitutional claims, his claims of municipal liability cannot survive summary judgment. "Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted constitutional harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002). Plaintiff has not shown that a genuine issue of material fact exists on any of his constitutional claims. Because he presents no evidence showing that he suffered any constitutional harm, his claims against Defendant Township alleging a policy of retaliation and selective enforcement motivated by retaliation fail. *See Tucker v. City of Richmond*, 388 F.3d 216, 224 (6th Cir. 2004) (observing that "[i]n light of our holding that [the plaintiff] has suffered no unconstitutional retaliation, his claim against the City [alleging a policy of unconstitutional retaliation] must fail.").

---

[17]In his amended complaint, Plaintiff alleges that Defendant Township had a policy, practice, and pattern of retaliating against Plaintiff (Count I, ¶ 87) and of selectively and vindictively enforcing unlawful decisions against Plaintiff (Count III, ¶ 100).

**IV.   Conclusion**

For the above-stated reasons, Plaintiff's motion for partial summary judgment is

DENIED, and Defendant's motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 16, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 16, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager